SlBLBY, J.
The case of John H. Donald against the State of Ohio is in this court on a petition in error, seeking to reverse the finding and judgment of the common pleas, The plaintiff here, the defendant below, is indicted jointly with his son, William L. Donald,of the offense of murder in the first degree. A separate trial was had of the plaintiff in error, and he was convicted of murder in the second degree. In the progress of that trial certain supposed errors intervened, and we are called on to pass upon the questions which are thus made.
*127 All the testimony is set out in the most extensive record that I ever saw in a court of justice. We are fully aware that this is a case of importance — all cases involving a right under the law may be said to be important — 'but we cannot disguise the fact that some are apparently of greater importance than others, Some cases are, in the mere circumstance that the trial of them involves a very large expense to the public; but with, a consideration of that kind, neither a court of review nor the trial court has anything to do, so far as respects the rights of the parties to the controversy.
, The defendant having been found guilty of murdér in the second degree, the judgment against him is one of very great moment so far as he is concerned. His right, however, to have us pass upon the alleged errors presented by this record would be the same if he had been found guilty of a simple assault; yet the gravity of the finding and judgment, as well as the general character of the transaction out of which the guilt has been found, can not but impress us with their importance to him, and also to the state, in the preservation of its order and the rights of its citizens.
The errors alleged may be conveniently classed for consideration into three general divisions. The first division relates to exceptions arising (I) out of the testimony, of witnesses, apart from any question of alleged conspiracy; (2) to evidence offered by the state and admitted by the court on the theory of conspiracy between the defendant and his son; and (3) to evidence offered by defendant relative to acts and attempts of Charles B. Halfhill and persons other than the deceased, (Snyder),to take the life of the defendant, such evidence having been refused.
The second division refers to the special charge given at the request of the State and excepted to by the defendant; and to the special charges requested by the defendant and refused by the court. The third division embraces exceptions to what is contained in the general charge to the jury.
Before entering upon a specific consideration of the alleged errors, I make a general statement in relation to the testimony of witnesses to the transaction, out of which the various aspects of the controversy arise. It is clear that the defendant below, plaintiff in error, Mr. Donald, and the deceased, the one whom he is charged jointly with his son *128 with having feloniously killed, came in sight of each other in the town of Higginsport, in this county, and that a rencontre between them followed, the outcome of which was the death of Snyder. The first dispute of fact is as to who began the shooting. There is substantially no question that the conflict after its inception continued between the parties until Snyder was killed. It is further a matter undisputed that these two men had been for years in feud, and the enmity and state of feeling was such that either reasonably might expect that, on slight excuse, the other would kill him if he had a chance.
I. Upon the trial of the case, there was tendered in evidence by the defendant a statement by William L. Donald at his home, made immediately upon his arrival there, whence he and his father had gone at once after the firing of the fatal shot. This evidence was rejected by the court, and the defendant excepted. I take it up first, as I wish to clear the case of the less important features of controversy.
Now, we have not the slightest hesitation in saying that William’s statement made at that time was wholly incompetent. It could not have been admissible, unless as part of the res gestae, and Ihe time had elapsed when it could be such, in our estimation. If it had been a declaration made at once, or there at the place of the transaction, as explaining why he shot, assuming he fired the fatal shot, it would be admissible, but it had passed beyond that. He had left the scene of the killing and gone to his home, and the conversation there was mere narrative, hearsay, having no proper bearing upon the case.
The next thing to which I refer is the act of the court in admitting certain evidence in rebuttal. The rule, as we have always understood it to be, is, that anything competent in chief is thereby made incompetent in reply. This is the only principle, so far as I know, by which you can discriminate evidence which, within strict rules, should not be given in rebuttal. Hence, what is admissible in chief is incompetent when it comes to reply. Now, we are pretty clear tha 'his was properly evidence in chief, and should have been so given. But while the rule is as stated, there is a discretion in the trial judge to relax it and re-open the *129 case for the purpose of admitting evidence that properly was in chief,
And we think that there ought not to be a failure of justice in the trial of a case, because of a slip or omission in evidence; or if testimony is discovered after the evidence in chief is closed, important to the case the State is prosecuting, or in civil suits as well,
I presume all trial courts have re-opened cases for the purpose of letting in, during the reply, new evidence that properly and strictly would be in chief. But in connection with that the rule always has been, as we have understood and seen it applied, that if the plaintiff re-opens, the defendant has a right to rejoin. Hence, if it happens that witnesses have been discharged and the defendant would thereby be debarred of the power to answer, the case would not be re-opened; such circumstances would be a limitation upon the discretion for that. Now in this case, the record does not show that the defendant was denied the right to answer if he saw fit; and it fails to disclose that he was deprived, by re-opening the case, of the means of answering. So that sufficient grounds do not appear for saying the court below, in the exercise of its discretion to permit a relaxation of the rule, did anything prejudicial to the defendant. For aught that appears, he was still able to answer the new evidence, and there is nothing to show that he was not permitted to do so, We think, therefore, there was no •error in that action.
Exceptions were taken to the testimony of the stenographer, who testified to evidence given by the defendant, Donald, in a former trial. The sole question made was as to her qualifications to state from memory — she not being able to find her notes — the substance of all the evidence that Donald had given on that occasion. The testimony sought to be made use of related to a single feature of the transaction that had been in controversy in the former trial. Inquiry by defendant’s counsel was directed to the question whether she could remember and re-state the substance of all of Donald’s testimony in that case. The stenographer said that she could not, hut, with equal decision, stated that she could give the substance of his testimony upon the point injssue here — state the substance of all he said on *130 the matter to which the examination would relate. On that statement the court admitted the testimony, and the question presented is whether or not that was error.
In a volume entitled “Abbott’s Trial Brief”, the general doctrine in such cases is thus stated: “The rule that the witness must give such former testimony, substantially and in all its material parts, does not require him to reproduce the very language. ” In a case there cited from the 80 Ky., and followed in 63 Iowa, this we find: “If the statement appears on its face to cover the substance of what the deceased witness testified to in reference to the material matters in issue, the evidence shoud be allowed to go to the' jury for their consideration. When the witness stated that he had heard the whole of the testimony of deceased wi ness, and that he remembers the substance thereof, the court will not be justified in taking it from the jury, unless from the statement of the witness himself it obviously appears that he does not remember the substance of what the deceased witness testified to in reference to the material issue being considered.”
It is evident that any other ruling might deprive the-party of his right to reproduce the evidence or declarations of parties who testified in a former trial or suit, whether now living or deceased.. It would be impossible for a listener to remember the testimony of a witness, if of any great length,except in the very rarest instances of memory, and therefore it is a reasonable application of the general doctrine that it is sufficient if, in respect to the matter that is material in the trial, the witness can state the substance of all that the former testimony contained. We think,, then, that the stenographer in this case was qualified.
The next point to be considered is the defendant’s claim’ of right to submit evidence to the jury of the conduct and declarations of Halfhill, Snyder, and one or two others toward him, based on an alleged conspiracy between Snyder and these others to do him violence. I shall not go into the particulars of that; it presents, in the first place, a question peculiarly within the province of the court below in such cases, for determination. Counsel and the bar are familiar with the proposition that, before evidence can properly go to a jury of the declarations of alleged co-con *131 spirators, where one alone is on trial, and against bina, there must be what the law terms a prima facie case shown to the court Here, all the facts were adduced, which the defendant had to offer on the question of the conspiracy he sought to establish in order to obtain the admission of declarations, especially of his wife, fand I suppose he, too, would have testified had it been admitted) in regard to a transaction in an alley along in 1892, claiming that at that time Halfhill had joined with Snyder, the man who was killed in this affair, in a fierce assault upon Donald. The special bill of exceptions in its material parts reads: “Be it remembered that on the 17th day of March, A. D. 1900, and' in the trial of this case evidence had been already offered by the defendant tending to prove that the deceased, William S. Snyder, had, on a certain Sunday afternoon in the town of fiigginsport, Brown county, Ohio, in the year 1892, violently assaulted the defendant, John H. Donald, and that at the time he did assault him one Charles Half-hill, who was at that time the acting marshall of the town of Higginsport, was present and assisted in the assault, participating therein; that no evidence had been offered on the part of the defendant tending to show that there had existed a criminal conspiracy between the said Charles Halfhill and William S. Snyder, the deceased in the present case, and one William Duffey to get rid of or put out of the way the said defendant, John H. Donald, by violent means. And thereupon the defendant, to further maintain the issue on his part, called one Eliza Donald, the .wife of the defendant, who was inquired of as to where she lived during the year 1897, and who in response to the inquiries of counsel for defendant testified as follows:”
The bill then recites the preliminary testimony, of Mrs. Donald, which was permitted to be given to the jury until the witness sought to testify to the individual acts of another than the deceased; Snyder, when the court sustained the states objection to such testimony. Thereupon the bill further sets out that the defendant expected to prove by said witness, in answer to the question objected to, that “on.the night of the 2th day of November, 1897, while the witness, her husband and their young child were in bed in their sleeping room, and about the hour of 10 o’clock at *132 night, five shots were fired at and toward their said house and sleeping room, and that one pistol ball from among said five shots struck the outer wall of their said sleeping room, producing an indentation therein snd afterwards falling upon the floor of said sleeping room; that said bullet passing through said sleeping room, passed above but near the bed wherein the said wife, her husband and said child were asleep, her husband being the defendant herein.” Then, by further testimony, it is stated that they expected to show that Halfhill fired those shots, said Halfhill being the same Halfhill whom it was alleged was present and participated in the assault upon Donald in the alley.
There is some evidence of circumstances where Halfhill and Duffev, perhaps Halfhill only, appeared in other ways to have shown ill-will towards Donald; of a disposition perhaps to harm him; but the court finds as a fact that there is no proof tending to show that Halfhill and Snyder, by any pre-arrangement or conspiracy, joined in the assault that was made upon Donald in the alley in 1892. Upon the proposition of conspiracy between the deceased, Snyder, and the deceased Half hill, the court also finds against the defendant. Counsel for defendant contend with great force that, notwithstanding the finding of the trial court, the record discloses sufficient evidence of such conspiracy to send it to the jury, and that in refusing so to do error was committed. We cannot say that the court erred in rejecting this evidence. It may be a case where different judges might have differed upon the proposition, and we do not say that if it had been admitted, it would have been error.
It was a question on a matter primarily with the trial judge. We are of the opinion that he did not err in that regard.
It is contended, on behalf of the plaintiff in error, that the evidence proposed to be given by the wife and other witnesses, would be competent independent of any question of conspiracy, as bearing upon the state of mind in which the defendant below stood with reference to the man killed, and so we are called upon to consider that proposition, We cannot see that the rejected testimony reaches to that extent, or relates in any way to the transaction out of which arose the death of the man Snyder. Of course, it *133 was evidence against Halfhill, would be if he were on trial of the most cogent sort, as to his disposition, and would have been equally so without regard to whether he bad been firing into the house of the plaintiff in error, John H. Donald, or not. But how can it be relevant to the controversy arising as to the state of mind' — -the conspiracy unproved — of the plaintiff in error in reference to the transaction out of which grew the death of Snyder? We are unable to see the connection by which the enmity of Halfhill as an individual, independent of the other, could have such legal relation as to make it competent evidence to be introduced in behalf of the defendant below, Donald, when charged with the killing of Snyder; and must, therefore, say it was rightly ruled out, On the whole controversy here raised with reference to the Halfhill testimony as it is made to appear by the record before us, we think the court below fell into no error.
We now come to the State's claim of conspiracy. It is a familiar and elementary doctrine that proof of conspiracy must precede the declarations of conspirators, and their declarations are admissible only in so‘far as they become verbal acts or operate in furtherance of a common purpose. So, too, a co-conspirator may make many statements that would be competent and cogent evidence against him were he on trial, which would be wholly incompetent against the other conspirator when he is being tried. But on the question of conspiracy Justice Bradbury has stated, (46 Ohio St., 463) that “Much latitude is necessarily left to the trial court in determining whether or not there has been introduced sufficient prima facie proof of a conspiracy to admit evidence of the acts and declarations of one claimed to be a co-conspirator with the defendant on trial.”
That is the general principle, and there is no better statement of the rule as to the necessity for a wide degree of discretion. On the exception now under consideration, the court here must be able to say that there was in some point no proof of conspiracy, or the ruling of the trial judge will stand. It finally results in leaving that matter very largely within his discretion, governed by all the circumstances disclosed in the evidence bearing upon the question. We can not say that the trial judge erred in admitting any *134 competent declaration of William L. Donald as a co-conspirator; that is, in holding that there was sufficient evidence prima facie to put him in this category, in view of the principles by which we conceive ourselves to be governed.
We next come to the exception to the admission of evidence of the individual acts and declarations of William L. Donald, on the claim of the defendant'below that said acts and declarations were not in furtherance of. the alleged conspiracy. The doctrine is laid down clearly in the Fouts case (7 Ohio St., 471), and the Clawson case (14 Ohio St., 234), the rule being stated there as a general legal proposition, that any act or statement, relied upon as competent upon the theory of conspiracy between the party who made or did it, as against another on trial, must be in furtherance of a' common purpose or design. Common purpose is a familiar expression or phrase frequently used in the books as equivalent to community of purpose, or of a design that was not only one of each, but of both, Assuming that the conspiracy was sufficiently proved, we are called upon to review the evidence of independent acts and declaraiions of William L. Donald, objected to upon the ground that even in that view they are still incompetent.
The first is William L, Donald’s declaration to another man in his father’s absence: “Are you coming to town to-day? .There is going to besóme shooting there; if father don’t kill a man, I will.” Now the question is whether that is in furtherance of a common design. On the authority of the Fouts’ case, we think not. . It is a declaration of William’s purpose; if his father did not do the act, he would do it. It does not point to something that they were to do jointly; he simply declares that if his father fails to kill a man that day, he will kill him. The name of Snyder was not mentioned, in fact no name was given. Now take the illustration given by Fouts’ case. There, the man who was killed is named as one who ought to be killed, and the conspirator declared that he was going to do something which would put him in the penitentiary; with the further declaration that Scott, the person afterwards killed, was not fit to live; which showed that his declaration related to the killing of that man. But it did not couple with him any *135 one else in the act. In that case, notwithstanding the fact that the conspiracy was shown, the declaration was rejected, and we think it must be in this.
Then further: “1 would as soon shoot Snyder as I would a rabbit.” This declaration has not the slightest relation to any common purpose of William L. and his father, but is an independent declaration of his own feelings. It would be cogent evidence against him if he were on trial, but as far.as it relates to his father, it has not the least tendency to further or show a common design to kill Snyder. That is the lacking element in both of the declarations to which I have referred, We hold, therefore, that it was prejudicial error to admit them.
The other exceptions are in regard to the testimony of witnesses who testified as to having seen William L. Donald around at various points in the vicinity where the killing occurred. We regard that evidence as properly admissible for the purpose of showing what he was doing in furtherance of a common design. So that in respect to all the testimony admitted on the theory of conspiracy, we hold there was error in respect to those two declarations only. Two witnesses testified to the rabbit statement, and one to the other matter. This disposes of all questions made as to conspiracy, or the admission and rejection of testimony, and, as I have said, we find no error except in the particulars specified.
II. I come now to instructions to the jury, and shall first taka up exceptions to the' special charges. The case, from its very nature, requires considerable time to dispose of it, and I will be excused for not trying to rush it through.
The first exception made that counsel rely on in argument, is to special instruction No. 9. However, before disposing of the objeection to this charge, I want to take the liberty of commenting on the practice of loading the court with special charges by the cart load. WThen an instruction is once clearly stated, to repeat it in a different form is calculated to confuse a jury; for if they have two charges on the same subject, .one in one form and another in varied form, it ik very natural for them to think that these charges must have some different import. Hence, *136 after a proposition of law relative to the case had been once covered, let counsel keep their repetitions, instead of throwing them at the jury. This is the unquestionable right of the trial court which it would be well for it to exercise. Of course, there arise different phases of a case from which charges with a view to varying aspects may be material and important; and where such is the situation the court should meet it. The object of a charge is to bring into view (1) the issues in the case, and (2) other aspects — developed on the trial — to show the jury by a proper statement of the law, how the evidence should be applied.
When that is done, the charge is complete in legal view. All that goes beyond tends' to confusion; and into error courts may fall if they give a long string of chargee, varying slightly in form — are made to lose sight of the real case.
Special Instruction bio, 9 is this: “While the burden is on the state, in the first instance, to prove beyond a reasonable doubt an intentional killing, yet if it has done so, or if that fact is admitted by defendant in this case, the burden is on defendant to make out his defense; and for him to do so, he must satisfy you by a preponderance of all the evidence in the case:
“First: That at the time he fired the fatal shot, he did, in the careful and proper use of all his faculties, honestly believe and have reasonable grounds for believing, that he was then and there in imminent danger of losing his life, or suffering enormous bodily harm from an assault at the hands of the deceased, William S. Snyder. And
“Second: When he so-fired the fatal shot, he had no other means of averting the loss of life or preventing great bodily harm from assault at the hands of the deceased, William S. Snyder, than shooting and killing him, the said William S. Snyder; or at the lime he fired he honestly believed and had reasonable grounds to believe that he had no other means of averting said danger than shooting, as it is alleged he did shoot.”
Counsel for defendant contend that this charge shifts the burden of proof absolutely on proof of an intentional killing, without making it an unlawful killing, and it may be a very nice question indeed, whether or not the point is *137 ■well taken. As our law now defines manslaughter, it is simply an unlawful killing- Every lawyer understands that there are many intentional homicides which are perfectly lawful. If the court had said unlawful killing, that objection would have been removed; or if the court had said intentional and malicious killing, the objection would not lie. Either unlawfulness or malice implies a killing which renders the party guilty, amenable to the law; but in view of what is said in the opinion in the Silvus case (22 Ohio •St., 90), and the authorities there cited, we are not willing to go so far as to say that on this ground the charge is erroneous.
Special instruction No. 10 is the next one excepted to. “If the evidence in the case shows, beyond a reasonable doubt, that the defendant unlawfully and purposely shot and killed William S. Snyder, and defendant claims he did the act in self defense, in determining this issue you are not to apply the rule of reasonable doubt, but the burden rests upon the defendant to satisfy you by a preponderance of all the testimony in the case that the shooting and killing was done, not of malice, but in the necessary defense of his person from death or enormous bodily harm at the hands of the deceased.”
This is an illustration of giving a charge and over-look ing a feature that belongs to it, Here it is made the obligation of the defendant, in order to exonerate himself, to süow that the shooting was done by him in the necessary defense of his person. It leaves out the element of reasonably apprehended or apparent danger which may justify one in exercising the right of self defense, and puts it upon the necessity from imminent danger in fact. The charge is palpably erroneous on that ground.
Charges eleven and fourteen are grouped together and exceptions are taken to the giving of them. Charge eleven reads as follows: “The defendant is not justifiable or excusable in taking the life of William S. Snyder, although he believed, in good faith, that he was in imminent danger of death, or great bodily harm, and that his only means of escape from such danger consisted in taking the life of said William S. Snyder, unless there were reasonable grounds for such belief, ’ ’
*138 Charge fourteen is this: “If the State has proven, beyond a reasonable doubt, that the defendant, John H. Donald, did shoot and kill the deceased, William S. Snyder, or if the defendant has admitted that he fired the shot that killed the said Snyder” — as I understand it, there is no admission of that kind whatever in the record, and while this statement in the charge is not seriously prejudicial, yet it should not be given in any charge where it can be properly excluded if by possibility it might be misleading — “then it is not sufficient that the defendant show you that he honestly believed, at the time be fired the fatal shot, that he was in danger of loss of life, or of suffering great bodily harm from an assault made by the deceased, William S. Snyder; but he must go further and satisfy you by a preponderance of all the evidence that, at the time he fired the fatal shot, he had reasonable grounds to believe he was in such danger.
These two instructions, we think, simply state the law of self defense — the rules that apply on the authority of Marts against the State — in substance, the rule of proof in respect to the claim of self defense, and we do not see that they are objectionable; if at all so, it is only because they may be said to twice state the rule. The last one is sufficient alone, The first is superfluous if fourteen is given.
Charge sixteen: The criticism of this charge rests upon the phrase “had formed a common purpose”, and the point made is that there might be a common purpose without community of purpose, that the jury might find that each sparately had formed a common purpose — and so under this instruction hold the defendant on trial responsible for the act of William, if he fired the fatal shot, notwithstanding there was no unity of purpose or conspiracy between them. But on looking into the meaning of the term “common”, and examining the books as to uses of it by courts and lawyers, we are inclined to think the criticism, though very keenly put, is not valid as against the right of the court to phrase the matter in that form, For example, Justice Bradbury, in the Goins’ case, in discussing conspiracy says —referring to the testimony that had been offered: “Its admissibility depends upon its having been made by a co-conspirator in furtherance of a common purpose”. It is evidently treated as a phrase, which is equivalent to unity *139 of purpose — united in a common design, and in fact in common parlance we so regard it. After a careful consideration, we are convinced that there was nothing in the statement which was calculated to mislead he jury, and we hold, therefore, that there is no error in the charge upon that ground — which is the only criticism made — proof of conspiracy being taken for granted.
Charges seventeen, nineteen, twenty and twenty-one are all excepted to and all objectionable, as we think, on a common ground. I will read Charge seventeen: “If the jury find from the evidence, beyond a reasonable doubt, that the defendant and William L. Donald were each present at the time that William S. Snyder was killed, each aiding and abetting the other in the killing, and that William S. Snyder was then and there unlawfully shot and killed, the defendant is responsible for such killing, no matter whether he fired the fatal shot or that it was fired by William L. Donald; unless you further believe from the eivdence that such shooting was done under circumstances which made the same either justifiable or excusable.”
Now, as we understand this record, there is no evidence for the application of the doctrine of aiding and abetting; nothing to show that John Donald said or did a thing to induce William L, Donald to fire the fatal shot, if he fired it, and John Donald, therefore,in this view of the case, was not aiding and abetting William L. Donald. He was an' independent actor within the principle of the Woolweaver case (50 Ohio St., 277). This clause, or its equivalent, runs through all this line of charges, and is not warranied, we think, by the testimony of. witnesses who gave in its substance what occurred at the time of the killing; there is no evidence that puts John Donald in the relation of an aider and abettor of William L. Donald; in fact, we think there is a total'failure of proof on that point. By the disclosures of testimony here, the case must stand on the fact that John H. Donald fired the fatal shot, or that William fired it as a co-conspirator with him to kill Snyder, and not upon the theory that John H. Donald was there aiding and abetting his son, William, in his shooting and killing Snyder, if he fired the fatal shot. To throw that element in, thrusts a prejudicial confusion into the case which has *140 nothing in the evidence to warrant it. In that view, seventeen, nineteen, twenty and twenty-one are held to™be prejudicially erroneous. p -
III. This brings me to the general charge. The first exception, the less important one, I shall consider first, although it comes later in the charge. “If the jury find that the shot that killed Snyder was fired when the two men were lying in the gutter on the west side of Jackson street, and that during the conflict preceding their falling into the gutter', Snyder had become disabled or disarmed, or both, and the danger to which the defendant, Donald, had been subjected before they fell into the gutter had passed, regardless of how it may have been brought on, and the defendant in the proper use of his faculties, if at the time he had the proper use of his faculties, knew or had' reasonable grounds to know and should have known that Snyder had, after the beginning and during the continuance of the conflict, become disabled or disarmed, or both, and was not in a condition to kill the defendant or do him great bodily harm by reason of being so disabled or disarmed, or both, then the defendant, Donald, would not be in a situation to invoke the law of self defense and take the life of Snyder under such circumstances, if he did so take it.”
This.is objected to. The clause “and should have known that Snyder had” has been the one criticism,on the ground that it is contrary to the law of self-defense as laid down in the Marts case. We have given this objection careful consideration, because we were somewhat impressed by the argument for it; but on looking closely we think no substantial fault is shown. There was a state of facts proved that justified a charge of the general character to which this belonged, That is to say, the evidence showed that each of the men, in the beginning of the fight, had a pistol; that after they came together, Donald fired one shot that took effect upon the body of Snyder; and there is enough to fairly show that, coupled with this, Snyder threw up his hand and dropped his pistol — enough to show, therefore, that as far as that pistol was concerned, he was disarmed. They struggled on, however, and both fell into the ditch, As to which was on top or which under in the fall is a *141 matter of controversy; but there is evidence to go to the jury upon in argument and justify an instruction from the court on the theory that, by the shot and the loss of weapon, Snyder had become disarmed and disabled; and therefore, that if the defendant below, Donald, knew this, and that he was no longer in danger of great bodily harm, then he had no right to shoot him. It amounts in substance to this: that if the jury should find that the defendant knew Snyder was disabled and disarmed, they would be warranted in saying he had no ground of self defense — that he could not under such circumstances have had an apprehension of death or of great bodily harm. This is within the general principle in the Marts’ case — that the grounds of self defense are either an actual or a reasonably apprehended danger of death or great bodily harm. By throwing in the clause most criticised by counsel, the State has been harmed rather than the defendant, The court, doubtless in view of the testimony of the defendant that he was dazed and bruised and scarcely knew what he was doing, says: “If the defendant, in the proper use of his faculties, that is if at the time he had the proper use of them’’ — thus making it obligatory upon the jury to find that he must have had the proper use of his faculties in order to put' him under the requirement which this charge suggests.
"We find, then, that there was no error on the part of the court in that feature of its general charge,
Next comes what has been the great core of controversy and around which the battle has waged. And here I state what I intended to say in the beginning, that, on behalf of both the State and the plaintiff in error, the case has been fully and ably argued, and we do not think that anything further to aid the court in its investigation.could have been given by other counsel. Finally we are left to do the work of decision with the best judgment we possess and the light afforded'us- — and we think it all has been turned on.
On page 2202 of the record the other objectionable clause is found, Perhaps I had better read the whole paragraph, in order to put in view fairly the court below on this feature of the charge.
“To make the defendant in such a case the sole arbiter of the facts would insure acquittal in most instances when *142 the plea of self defense was set up, and thereby tend to disturb the peace and security of society without much probability of redress. But such is not the law. While the defendant at the'time was sole judge, and while you shall not judge his judgment when formed, if formed at all, with nicety or severity, yet it is your duty to judge whether his judgment was an honest judgment, and whether the circumstances were such as afforded a reasonable ground for the belief that he, at the time the fatal shot was fired, was in imminent danger of loss of life or of receiving great bodily harm.” If I were making a verbal criticism, I would, say a ‘‘sincere judgment”, ‘‘sincere belief”, for the doctrine of self defense is in this aspect a doctrine of good faith.
‘‘The appearance at the time the fatal shot was fired must have been such as to have alarmed a man of ordinary firmness and impressed him that his danger was imminent.”
The supreme court has said, ‘ ‘ bona fide believes that there was such danger”. This is the first clause in which the words ‘‘ordinary firmness” appear, and it is. applied directly to the time when the fatal shot was fired. The next clause is like unto it, only a little worse. ‘‘And if he acted under such circumstances, that is under what reasonably appeared to be real danger at the time the fatal shot was fired, it is immaterial whether it was real or not. But you will remember, gentlemen,, that the foundation of the legal right to take human life is self defense, and that necessity must be real or the appearance such as to impress an honest man of ordinary firmness with the honest- belief that such appearances are real, and that he is in danger of loss of life or of receiving great bodily harm. By the use of the terms ‘great bodily harm’, or ‘enormous bodily harm’, is meant something more than a mere beating or thrashing. Something of a more lasting or permanent nature is meant. For no man would be justified in shooting or wounding or killing an assailant who merely meant or was in the known condition as to weapons only to give him a thrashing or beating. In this case, gentlemen, it is for you, from all the circumstances in the case, to say whether or not at the time the defendant fired the shot that took the life of William S. Snyder (if such you find the case to be), there was any necessity for so doing, and whether the cir *143 cumstances were such as would have impressed an honest man of ordinary courage with an honest apprehension of danger of the loss of life or of receiving great bodily harm, either to himself or to one whom he had a right to protect.”
Aside from the other authorities cited, after a full consideration of the subject, in the light of the decision in the Marts’ case, (26 Ohio St,, 162) which is the unmodified authority in this state for the law of self defense, we are compelled to say that what I have read in regard to an honest man of ordinary firmness, or of ordinary courage, are wholly misleading, 'and thrust upon the jury a consideration with which they have nothing to do. The test the supreme court makes' — 'the law — is not what a man of ordinary courage or firmness might do under similar circumstances, but whether or not, in the light of all the faets apparent to the defendant, as disclosed by the testimony, he was acting on the bona fide apprehension of imminent danger, and had reasonable grounds therefor. The Marts’ case must be reversed in some material features, before we could hold this charge correct. The decision in the Martin case (17 Circuit Court, 406), cited by counsel for defendant, is not only relevant, but required by the logic of the Marts’ case; that is, it puts the question not only upon what the real fact was, if the fact is sufficient to show that the defendant was in real danger, but it goes a step beyond that and permits the defendant to act upon the actual appearances before him, without regard to real danger, provided those appearances be reasonably well grounded.
To say one must stand as a man of ordinary firmness, or of ordinary courage, and beyond all the most extraordinary requirement, that he must be an honest man in order to avail himself of the fight of self defense, is' clearly error. As this charge reads, before applying the rule of self defense the jury was required to determine the character of the defendant in respect to honesty, and then to determine whether an honest man would have believed as the defendant did; and if they took the view that Donald was not exactly of that type; that he was, in business dealings, perhaps, a goundral, they might debar him of the right of protection under the real law of self defense. It seems to me this needs no further comment.
*144 The law of the state, as given in the Marts case, is: “That homicide is justifiable on the ground of self defense where the slayer in the careful and proper use of his faculties, bona fide believes and has reasonable ground to believe that he is in imminent danger of death or great bodily harm, and that bis only means of escape from such danger will be by taking the life of his assailant, although in fact he is mistaken as to the existence or imminence of the danger. ” And the question as to what an honest man of ordinary firmness or courage would have done under like circumstances, is misleading and ought not to go into a charge on self defense.
The result of it all is, that while we are reluctant to reverse judgments, where the impression is made upon our minds, as it is in this case, that we could not disturb it upon the weight of testimony alone, yet we find ourselves very clear in the conclusion that this one must be reversed and a new trial granted.